# No. 26-172

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

---

MAPLEBEAR, INC., D/B/A INSTACART, a Delaware Corporation,
*Plaintiff-Appellant*,

v.

CITY OF NEW YORK, et al.,
*Defendants-Appellees*.

---

Appeal from the U.S. District Court for the Southern District of New York
Case No. 1:25-cv-9979 (JGK) –John G. Koeltl, District Judge

---

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE BUSINESS COUNCIL OF NEW YORK STATE, INC. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

---

Stephanie A. Maloney
Matthew P. Sappington
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
smaloney@uschamber.com
msappington@uschamber.com

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), undersigned counsel certifies that the Chamber of Commerce of the United States of America ("the Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Undersigned counsel further certifies that the Business Council of New York State, Inc. does not have any parent corporations, nor does any publicly held corporation own 10% or more of its stock.

Dated: May 15, 2026                    /s/ Adam G. Unikowsky

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF INTEREST.................................................................. 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ................................................................................. 3

I.  The Gig Economy Has Created Economic Opportunities for Millions of Independent Contractors, Including Instacart's Drivers.................................. 3

II.  The Local Laws Will Harm the Very Workers and Consumers They Purport to Protect. ...................................................................... 13

    A.  Local Law No. 124 will force Instacart to replace the open-market model with rationed access, eliminating the flexibility that defines gig work. ................................................................ 14

    B.  The remaining new Local Laws similarly will harm workers and consumers. ...................................................................... 21

CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Saleem v. Corp. Transportation Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017) ............................................................................................5

**STATUTES**

Seattle Municipal Code § 8.37.050.........................................................18

**OTHER AUTHORITIES**

Yuan An, Andrew Garin & Brian K. Kovak, *Delivering Higher Pay? The Impacts of a Task-Level Pay Standard in the Gig Economy*, (Nat'l Bureau of Econ. Rsch., Working Paper No. 34545, 2025), http://www.nber.org/papers/w34545 ...............................19, 20, 21, 22

Monica Anderson et al., *The State of Gig Work in 2021,* Pew Rsch. Ctr. (Dec. 8, 2021), https://bit.ly/3TGXP5g ...........................................6

John M. Barrios et al., *Launching with a Parachute: The Gig Economy and New Business Formation,* 144(1) J. Fin. Econ. 22 (2022) ...........................................................................................10

M. Keith Chen et al., *The Value of Flexible Work: Evidence from Uber Drivers,* 127 J. Pol. Econ. 2735 (2019) ...................................7, 8

Namita Datta et al., World Bank, *Working Without Borders: The Promise and Peril of Online Gig Work* (2023), https://bit.ly/3JzctXC ...................................................................6

Samantha Delouya, *The Rise of Gig Workers is Changing the Face of the US Economy*, CNN (July 25, 2023), https://cnn.it/4bavyem.........................6

Matthew Denes et al., *Entrepreneurship and the Gig Economy: Evidence from U.S. Tax Returns* 38 (Oct. 31, 2023), https://bit.ly/4aORuw6.....................................................................10

Tawanna R. Dillahunt et al., *Online Grocery Delivery Services: An Opportunity to Address Food Disparities in Transportation-scarce Areas*, CHI '19, May 4-9, 2019, https://dl.acm.org/doi/pdf/10.1145/3290605.3300879 ................................ 12-13

Edison Research, *The Gig Economy* (Dec. 2018), http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf ........................7

Caroline George & Adie Tomer, *Delivering to Deserts: New Data Reveals the Geography of Digital Access to Food in the U.S.*, Brookings (May 11, 2022), https://brook.gs/3NI3YcG....................................12

*Instacart Economic Impact Report* (2025), https://www.instacart.com/company/static/pdfs/2025-instacart-economic-impact-report.pdf ........................................... 6, 7, 8, 9, 11, 13, 23, 24

Instacart Shopper, *How Earning with Instacart Works*, https://www.instacart.com/company/shoppers/shopper-earnings (last visited May 15, 2026) ...............................................................16

Mia Jackson, *The Pandemic Taught the U.S. How to Solve Its Hunger Problem*, The Daily Beast (Oct. 12, 2021), https://www.thedailybeast.com/online-markets-and-grocery-delivery-grew-big-during-the-pandemic-they-could-solve-americas-hunger-problem ...................................................................13

Suzanne Le Mignot, *South Shore Grocer Partners With Instacart To Bring Relief To Food Desert*, CBS Chicago (June 17, 2020), https://chicago.cbslocal.com/2020/06/17/south-shore-local-market-instacart-food-desert-delivery........................................................................12

Fran Maier, Lynn Perkins & Anna Zornosa, *Can't Stop, Won't Stop Her Side Hustle: Women in the Gig Economy 2018* (Sept. 5, 2018), https://blog.urbansitter.com/wp-content/uploads/2018/09/Cant-Stop-Wont-Stop-Her-Side-Hustle_-Women-in-the-Gig-Economy-2018.pdf ................................................................................................7

McKinsey Global Institute, *Independent Work: Choice, Necessity, and the Gig Economy* (2016) .........................................................................8, 9, 11

iv

JPMorgan Chase & Co. Inst., *Paychecks, Paydays, and the Online Platform Economy: Big Data on Income Volatility* (2016), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/jpmc-institute-volatility-2-report.pdf ........................ 8

N.Y.C. Dep't of Consumer & Worker Prot., Notice of Adoption (Dec. 26, 2025), https://shorturl.at/nHwfk ....................................... 14, 23

N.Y.C. Local Law No. 107 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-107 .................................................................... 21, 24

N.Y.C. Local Law No. 108 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-108 .................................................................... 21, 24

N.Y.C. Local Law No. 113 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-113 .................................................................... 23, 24

N.Y.C. Local Law No. 123 (Sept. 10, 2025), https://intro.nyc/local-laws/2025-123 .................................................................... 23, 24

N.Y.C. Local Law No. 124 (Sept. 10, 2025), https://intro.nyc/local-laws/2025-124 .................................................................... 14, 24

Public First, *U.S. App-Based Rideshare and Delivery: Economic Impact Report* (2024), https://bit.ly/4cYFeKJ .................................. 6, 8

Manav Raj et al., *COVID-19 and Digital Resilience: Evidence from Uber Eats* (June 2020), https://arxiv.org/pdf/2006.07204 ................................ 11

Isabella Gomez Sarmiento, *How Online Grocery Delivery Could Help Alleviate Food Deserts*, NPR (Dec. 19, 2019), https://www.npr.org/sections/thesalt/2019/12/19/787465701/how-online-grocery-delivery-could-help-alleviate-food-deserts ............................. 12

Juliet B. Schor & Steven P. Vallas, *Labor and the Platform Economy, in Reengineering the Sharing Economy: Design, Policy, and Regulation* 83 (Babak Heydari et al. eds. 2023) .................................... 6

U.S. Chamber of Commerce, Employment Policy Division, *Ready, Fire, Aim: How State Regulators Are Threatening the Gig Economy and Millions of Workers and Consumers* (Jan. 2020), https://bit.ly/3z0bKuF ............................................................ 9, 15, 16

v

Scott A. Wolla, *How Does the Gig Economy Support Entrepreneurship?*, Fed. Reserve Bank of St. Louis (Apr. 2024), https://bit.ly/4bcHvQL ................................................................................10

All parties have consented to the filing of this brief.[1]

## STATEMENT OF INTEREST

The Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Business Council of New York State, Inc., is the leading business organization in New York State. It represents the interests of firms large and small, and its membership consists of over 3,000 companies that employ more than 1.2 million New Yorkers. As an advocate for New York's employers, the Council brings a unique perspective to this challenge to New York City's Local Laws at issue, which negatively affect many of the Council's members.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.

*Amici* have a strong interest in this proceeding. One of *amici*'s key priorities is protecting innovation and entrepreneurialism against policies that stifle economic growth. Gig-economy companies such as Instacart are significant drivers of economic innovation and are threatened by state and local regulations that micromanage operations. New York City's Local Laws at issue, which purport to dictate the compensation that shoppers receive and the manner in which that compensation is calculated, are a classic example of the type of heavy-handed regulations that undermine the gig economy model and harm businesses, shoppers, and consumers alike. *Amici* have an interest in ensuring that businesses like Instacart and independent contractors like Instacart's shoppers can enter into mutually beneficial economic relationships.

## SUMMARY OF ARGUMENT

*Amici* agree with Instacart that the Local Laws at issue are invalid and supports its challenge. Instacart ably explains why the Local Laws are preempted by the FAAAA and state law. *Amici* submit this brief to explain why the Local Laws are not in the public interest. The gig economy has produced substantial and well-documented benefits for the workers who participate in it and the consumers it serves. Workers value the flexibility of gig work, and consumers have gained meaningful access to an array of services, including fresh groceries through platforms like Instacart. The Local Laws will dismantle those benefits. The most

2

rigorous empirical study to date of an analogous regime—Seattle's App-Based Worker Minimum Payment Ordinance—confirms that a minimum-pay standard fails to raise total worker earnings, suppresses tips, displaces a substantial fraction of incumbent workers, and raises consumer prices while reducing service availability.

**ARGUMENT**

**I.      The Gig Economy Has Created Economic Opportunities for Millions of Independent Contractors, Including Instacart's Drivers.**

This case concerns the gig economy—the economy that allows entrepreneurs to accept gigs if and when they please, rather than being tied down to particular jobs requiring them to work a set number of hours per day at their employer's direction.

The gig economy is nothing new.  Long before the Internet, independent contractors pursued gigs.  Electricians, plumbers, movers, interior designers, piano tuners, and innumerable other contractors work multiple jobs at multiple homes or businesses.  Artists like creative writers and musical composers, too, have always taken commissions from multiple patrons and completed them in their own spaces, on their own timelines, and pursuant to their own creative processes.

But the Internet has massively expanded the gig economy's scope.  By facilitating the matching of entrepreneurs and their customers, new technologies have dramatically expanded the gig economy, to the benefit of both the gig economy's suppliers and its customers.

Network companies that facilitate the process of matching providers with customers have spurred the growth of the gig economy. These platforms are remarkably diverse. Some focus on specific areas, such as Gigster (software engineering) and Airbnb (short-term accommodations). Others encompass a wider range of services, such as Thumbtack (home, business, wellness, creative design), and Upwork (accounting, copy editing, personal fitness). Still others are involved in commercial real estate, healthcare, handyman services, pet care, legal services, finance, fundraising, customer services, logistics, and management consulting.

One of the best-known new types of gigs in the Internet economy are gigs that allow people to use their cars to make extra money. Before the app revolution, thousands of Americans owned cars and were willing to use them to make extra cash, but they had no realistic way to find customers. Picking up hitchhikers or offering delivery services to restaurants was not a realistic option. If those Americans wanted to make money driving, they would have to quit their job, find a way to drive as a taxi driver or courier, and—in many cases—drive someone else's car. This was undesirable for Americans who wanted to avoid being tied down to a single type of work.

Platforms such as Uber, Lyft, and Instacart changed all that. Drivers who want to find passengers or deliveries can download an app and instantly be connected with passengers or consumers who want their services. Some platforms connect

consumers who need a ride with drivers.  Other platforms, such as Instacart, connect consumers with "shoppers"—people who will buy groceries and deliver them directly to consumers' doors.

The rise of such platforms has created new work opportunities for drivers of all stripes, especially those who want or need flexible arrangements.  By working independently—when, where, how, and for whom they wish—drivers who are constrained from taking traditional 9-to-5 jobs nevertheless can boost their income.  A parent can work around school functions; a retiree can supplement savings; an artist can work in between shows.  Independent work allows workers to take control of their earning potential and decide how to spend their time.

Meanwhile, many app-based drivers choose to contract with multiple companies simultaneously to ensure the greatest volume of work.  Independent contractors may take full advantage of the flexible working relationship by "toggling back and forth between different . . . companies and personal clients, and by deciding how best to obtain business." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 144 (2d Cir. 2017).  A driver, for example, could find a passenger using a rideshare platform for one trip, and then later deliver groceries using Instacart's platform.  Or a student can minimize student loan debt by balancing a courseload with gig work to make ends meet.

5

Internet-based gig work "is changing the face of the US economy." Samantha Delouya, *The Rise of Gig Workers is Changing the Face of the US Economy*, CNN (July 25, 2023), https://cnn.it/4bavyem; *see* Juliet B. Schor & Steven P. Vallas, *Labor and the Platform Economy, in Reengineering the Sharing Economy: Design, Policy, and Regulation* 83 (Babak Heydari et al. eds. 2023) (explaining that "the rapid growth of platform work" is a "defining feature of twenty-first century capitalism").

As of 2022, there were "7.3 million active drivers and delivery partners on major rideshare and delivery platforms," contributing "an estimated $212 billion to the U.S. economy." Public First, *U.S. App-Based Rideshare and Delivery: Economic Impact Report* at 6 (2024) ("*Public First Report*"), https://bit.ly/4cYFeKJ. According to a Pew nationwide survey, 16% of Americans have used a network platform to earn money. Monica Anderson et al., *The State of Gig Work in 2021*, Pew Rsch. Ctr. (Dec. 8, 2021), https://bit.ly/3TGXP5g. Globally, the World Bank estimates that there are around 435 million active online gig workers—12.5% of the global labor force. Namita Datta et al., World Bank, *Working Without Borders: The Promise and Peril of Online Gig Work*, at 58 (2023), https://bit.ly/3JzctXC. Over 600,000 shoppers accept jobs on Instacart alone, leading to $24 billion in earnings for those shoppers since Instacart's founding. *Instacart Economic Impact Report* at

16 (2025), https://www.instacart.com/company/static/pdfs/2025-instacart-economic-impact-report.pdf ("*Instacart Report*").

A diverse workforce has benefited from the gig economy. Nearly a third of Hispanic and African-American adults work in the gig economy. *See* Edison Research, *The Gig Economy* at 4 (Dec. 2018), http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf. And 61% of Instacart shoppers are women, while 50% are parents of minor children. *Instacart Report*, *supra*, at 17; *see also* Fran Maier, Lynn Perkins & Anna Zornosa, *Can't Stop, Won't Stop Her Side Hustle: Women in the Gig Economy 2018*, at 3 (Sept. 5, 2018), https://blog.urbansitter.com/wp-content/uploads/2018/09/Cant-Stop-Wont-Stop-Her-Side-Hustle_-Women-in-the-Gig-Economy-2018.pdf (noting the prevalence of women in the gig economy and the satisfaction reported by most women participants).

This independent-contractor arrangement offers real benefits to workers, including Instacart's shoppers. Because independent contractors own the necessary tools and equipment for the job, they have the flexibility and freedom to deploy those resources however they see fit. This flexibility allows workers to adapt to unexpected life events like a child's illness, new expenses, or another job opportunity by increasing or decreasing their gig work to the extent convenient for them. M. Keith Chen et al., *The Value of Flexible Work: Evidence from Uber*

*Drivers*, 127 J. Pol. Econ. 2735, 2740-41 (2019) ("*Flexible Work*"); *see id.* at 2791 ("While traditional workplaces do compete to provide flexibility to workers, the literature suggests that lower wage, lower skill workers typically have limited ability to respond to everyday shocks."). The average Instacart shopper works less than 10 hours per week on Instacart, 70% have multiple income streams, and 75% say they choose to work with Instacart because of the flexibility it provides. *Instacart Report*, *supra*, at 18; *see* Decl. of Jacqueline Tandler ("Tandler Decl."), Dkt. 20.1, ¶ 15. One study quantifies the value of this flexibility to drivers who use the Uber app as equal to "increases in wages of more than 50 percent." *Flexible Work*, *supra*, at 2792. Another study concludes that "schedule flexibility is worth an aggregated $11 billion to app-based workers each year." *Public First Report, supra*, at 21 (emphasis omitted).

The gig economy is beneficial both to workers who already have jobs and to workers who do not. Workers who have full-time jobs can accept gigs to supplement their income. *See* JPMorgan Chase & Co. Inst., *Paychecks, Paydays, and the Online Platform Economy: Big Data on Income Volatility* at 24-25 (2016), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/jpmc-institute-volatility-2-report.pdf. For underemployed or unemployed people, the gig economy provides a way to earn a meaningful income. *See* McKinsey Global Institute, *Independent Work: Choice, Necessity, and the Gig*

*Economy* at 84-86 (2016) ("*Independent Work*"). And it "enables people to specialize in doing what they do best and raises their engagement[,] . . . mak[ing] them more productive," including "through better skill matching of the right person for the right job." *Id.* at 87. Students can finance their studies by accepting gigs between classes. *See* U.S. Chamber of Commerce, Employment Policy Division, *Ready, Fire, Aim: How State Regulators Are Threatening the Gig Economy and Millions of Workers and Consumers* at 16 (Jan. 2020), https://bit.ly/3z0bKuF ("*Ready, Fire, Aim*") (noting that 37% of workers aged 18 to 29 reported engaging in gig work in the previous year, two-thirds of whom were students); *Instacart Report*, *supra*, at 8 (31% of Instacart's jobs go to workers under the age of 25). And seniors can supplement their income with part-time gig work without holding down a full-time job. *Id.* (15% of Instacart's grocery jobs go to seniors—more than double the share of seniors in the overall economy).

That independence and autonomy leads to job satisfaction. "In survey after survey, gig workers report that the primary benefit of gig work is flexibility. They gravitate to gig work because it allows them to make their own schedules and choose their own projects. They like feeling like their own boss." *Ready, Fire, Aim, supra*, at 36 (footnotes omitted). Eight in ten independent contractors preferred their gig work to "traditional" employment, while only one in ten said they would prefer a traditional job. *Id.* at 17.

9

The gig economy also creates opportunities for entrepreneurship. According to a 2023 study, "individuals who previously received income from the gig economy are significantly more likely to start new" companies, and this "effect is amplified for individuals with lower income, who are relatively younger, and who might benefit from flexibility." Matthew Denes et al., *Entrepreneurship and the Gig Economy: Evidence from U.S. Tax Returns* 38 (Oct. 31, 2023), https://bit.ly/4aORuw6. This is because "the introduction of the gig economy creates fallback opportunities for would-be entrepreneurs that reduce risk and encourage new business formation." John M. Barrios et al., *Launching with a Parachute: The Gig Economy and New Business Formation*, 144(1) J. Fin. Econ. 22 (2022). As a recent Federal Reserve article explains, "the gig economy provides services that people value, and it also has a spillover: It encourages entrepreneurial activity by supplementing and smoothing the income of entrepreneurs." Scott A. Wolla, *How Does the Gig Economy Support Entrepreneurship?*, Fed. Reserve Bank of St. Louis (Apr. 2024), https://bit.ly/4bcHvQL.

The gig economy also benefits the small businesses on the other side of the platform. By connecting independent restaurants, neighborhood grocers, and other local merchants with customers they could not reach on their own, platforms like Instacart expand the market for small businesses that lack the resources to build their own delivery operations or marketing programs. Instacart, for example, has helped

10

U.S. grocers generate more than $22.5 billion in additional revenue and create over 237,000 new grocery jobs since 2012, with nearly one in three of those jobs coming at small businesses. *Instacart Report*, *supra*, at 4, 6, 20. These effects are especially pronounced for the smallest, most vulnerable businesses, which traditionally have the thinnest margins and least access to advertising channels—and which survived COVID in part because gig platforms preserved their access to customers. *See* Manav Raj et al., *COVID-19 and Digital Resilience: Evidence from Uber Eats* at 21 (June 2020), https://arxiv.org/pdf/2006.07204 (documenting how "local businesses were able to leverage an online delivery platform to stay alive and generate much-needed revenue during this period of crisis").

Finally, the gig economy benefits the public. It is easier than ever for a consumer to find a driver, technician, or any other service provider within minutes, merely by using their cell phone. "Digitally enabled services are providing consumers with access to services that were once inconvenient to obtain—or that may not even have existed before." *Independent Work*, *supra*, at 87. Platforms like Instacart provide expanded choice, access, and convenience. *See id.* at 87-88. More than 25 million customers place orders on Instacart per year, and customers have ordered more than 30 billion items through Instacart. *Instacart Report*, *supra*, at 9. Those orders have yielded more than 1 billion hours saved. *Id.* at 10.

11

The gig economy is particularly beneficial for lower-income Americans who historically have had trouble accessing goods and services that higher-income Americans take for granted. Instacart's platform, which promotes the accessibility of fresh groceries, provides a classic example of that phenomenon. Many lower-income Americans live in "food deserts"—areas with low access to stores selling fresh, healthy food. As researchers and policymakers have recognized, online grocery delivery mitigates that problem. Isabella Gomez Sarmiento, *How Online Grocery Delivery Could Help Alleviate Food Deserts*, NPR (Dec. 19, 2019), https://www.npr.org/sections/thesalt/2019/12/19/787465701/how-online-grocery-delivery-could-help-alleviate-food-deserts; *see also* Suzanne Le Mignot, *South Shore Grocer Partners With Instacart To Bring Relief To Food Desert*, CBS Chicago (June 17, 2020), https://chicago.cbslocal.com/2020/06/17/south-shore-local-market-instacart-food-desert-delivery. Indeed, 90% of people living in food deserts—including over 95% in metropolitan areas—have at least one digital food access option. Caroline George & Adie Tomer, *Delivering to Deserts: New Data Reveals the Geography of Digital Access to Food in the U.S.*, Brookings (May 11, 2022), https://brook.gs/3NI3YcG.

Research shows that people who shop online for groceries obtain healthier food. *See* Tawanna R. Dillahunt et al., *Online Grocery Delivery Services: An Opportunity to Address Food Disparities in Transportation-scarce Areas*, CHI '19,

12

May 4-9, 2019, https://dl.acm.org/doi/pdf/10.1145/3290605.3300879. Instacart itself reaches 98% of all U.S. households that are enrolled in SNAP and 95% of households in low access areas. *Instacart Report*, *supra*, at 12. And government food-assistance programs have begun integrating with grocery-delivery providers, benefiting consumers experiencing food insecurity. *See* Mia Jackson, *The Pandemic Taught the U.S. How to Solve Its Hunger Problem*, The Daily Beast (Oct. 12, 2021), https://www.thedailybeast.com/online-markets-and-grocery-delivery-grew-big-during-the-pandemic-they-could-solve-americas-hunger-problem.

## II.     The Local Laws Will Harm the Very Workers and Consumers They Purport to Protect.

Platforms like Instacart create economic opportunity for workers and deliver tangible benefits to consumers. The Local Laws threaten those benefits by targeting the very features of the gig economy that make it work—the flexibility that draws workers to the platform and the open marketplace that matches them with consumers in real time. The result is a regulatory package that will leave shoppers earning less, working under more rigid conditions, and competing for a shrinking pool of available work, while consumers face higher fees and degraded service. The empirical study of an analogous Seattle ordinance confirms that these are not the speculative concerns of a regulated industry. These are the documented consequences of imposing a traditional minimum-wage framework on a non-traditional labor market.

13

**A.     Local Law No. 124 will force Instacart to replace the open-market model with rationed access, eliminating the flexibility that defines gig work.**

The centerpiece of the regulatory package, Local Law No. 124, is also the most disruptive.  As of January 26, 2026, it imposes the same minimum-pay standard on grocery-delivery workers that already applies to restaurant-delivery workers.  Beginning July 1, 2026, that pay standard will apply not only to time spent fulfilling orders, but also to "on-call" time—time during which a shopper is logged into the platform but not actively shopping or delivering.  *See* N.Y.C. Local Law No. 124 § 3 (Sept. 10, 2025), https://intro.nyc/local-laws/2025-124; N.Y.C. Dep't of Consumer & Worker Prot., Notice of Adoption 6, 8-9 (Dec. 26, 2025), https://shorturl.at/nHwfk (describing transition period and the on-call-time tracking requirement set to take effect July 1, 2026).  Under one prong of the standard, shoppers must be working more than 53% of the time they spend logged in.  *See* Notice of Adoption, *supra*, at 36 (describing "Utilization Floor").

The inevitable consequence is that workers will no longer be able to log in freely to Instacart.  Today, Instacart's platform operates as an open marketplace.  A shopper can log on whenever it suits her schedule, browse available batches, accept the ones she wants, and decline the ones she does not.  Compensation flows from the work she actually performs.  This model is what makes Instacart attractive to the parents, students, retirees, and second-job-holders who benefit from the gig

14

economy. But a platform cannot allow workers to log in freely if it must pay them a regulated wage during periods when no work is performed, as mandated by Local Law No. 124. To avoid paying for unproductive on-call time, Instacart may be forced to adopt new operational approaches, such as restricting who can log in (creating shifts, scheduled sessions, or invitation-only access), requiring shoppers to accept all or a minimum number of offered batches, or both. *See* Tandler Decl., ¶¶ 30-36 (describing why current open-market model is incompatible with the new pay regime). The result is that shoppers who use Instacart to supplement their income, while still independent contractors not covered by wage-and-hour laws, will lose the flexibility that makes Instacart an attractive platform. The shopper who today decides that she has two free hours and logs on to work might instead find a system in which a smaller, pre-selected group of workers operates on platform-defined schedules and is required to accept whatever the algorithm assigns. The flexibility that is the hallmark of the gig economy will vanish. *See Ready, Fire, Aim*, *supra*, at 5 ("Once companies face these regulations and costs, they will no longer be able to let workers choose when and where to work. . . . The flexibility and low barriers of entry that once marked the gig economy will become a thing of the past.").

That result will harm the shoppers who benefit the most from Instacart—those who want to earn extra income without committing to fixed schedules or to mandatory shifts. As the Tandler declaration explains, "[m]any shoppers rely on

Instacart precisely because they cannot commit to fixed schedules or shifts. They use Instacart to earn income around childcare, school, other jobs, or health constraints. For these individuals, a tightly controlled access model is not a practical substitute for today's flexibility." Tandler Decl. ¶¶ 40-41. For example, a parent who could log on for ninety minutes during a child's playdate will not benefit from a system that requires four-hour committed shifts and pre-acceptance of all assigned batches. Likewise, a student who could fit two hours of shopping in between classes will not benefit from a regime in which platform access is limited to a smaller pool of highly-utilized workers. *Ready, Fire, Aim*, *supra*, at 37 ("Military spouses, transitioning service members, ex-offenders, students, parents, and moonlighters may no longer have access to the gig economy. Legislators will have closed an avenue for millions of Americans to supplement their incomes or sustain themselves when they are in between jobs." (footnote omitted)).

To be sure, shoppers who continue to receive batches under the new regime will earn more base pay per task than they do today. But base pay is not take-home pay. Tips—100% of which go to the shopper, *see* Instacart Shopper, *How Earning with Instacart Works*, https://www.instacart.com/company/shoppers/shopper-earnings (last visited May 15, 2026)—currently account for a substantial share of total shopper compensation. As base pay rises, tips will correspondingly fall, because consumers seeking to avoid price increases will respond to higher checkout

16

prices by reducing the discretionary portion of those prices. Workers also bear new uncompensated costs that the regulated pay rate does not capture, such as longer wait times between tasks and additional unpaid mileage spent repositioning. And these are the costs borne by shoppers who *retain* platform access. The workers locked out of the platform by tightened controls will not lose merely a portion of their pay— they will lose all of it.

Local Law No. 124 also will undermine the two-sided marketplace of Instacart and similar platforms. Two-sided marketplaces depend on users on both sides: Consumers place orders because shoppers are reliably available to fill them, and shoppers log in because orders are reliably available to accept. When the City enacts legislation leaving Instacart with no choice but to restrict the supply of shoppers in order to comply with the on-call-time pay requirement, it does not merely subtract a fixed number of workers from the platform. It degrades the matching function itself. Fewer shoppers logged in means longer wait times for consumers; longer wait times mean fewer orders placed; fewer orders mean less work available for the shoppers who remain; and less work means still more shoppers exit the platform. What the Local Law treats as a one-time reallocation of compensation in fact results in the unwinding of the marketplace that brought shoppers and consumers together in the first place.

Local Law No. 124 will harm consumers, too. Restricting the flow of shoppers onto the platform means fewer shoppers available to meet consumer demand. Fewer available shoppers means fewer delivery windows, longer waits, and higher fees. Tandler Decl. ¶¶ 46–52 (anticipating that the Local Laws will produce slower deliveries, fewer delivery windows, and higher consumer fees).

The consumers who depend most on grocery-delivery platforms are not affluent customers ordering luxury goods. Rather, many people who depend on digital food access have low incomes. *See supra* at 12. For those households, a meaningful price increase across a basket of groceries is a serious burden that will force them to cut spending elsewhere, not a marginal inconvenience. Likewise, many Instacart consumers have difficulty going to the grocery store by themselves. They may have disabilities, lack reliable transportation, or live in neighborhoods that traditional grocery retailers do not serve. Reducing the supply of shoppers, lengthening delivery windows, and increasing fees harms those consumers the most.

Seattle's experience demonstrates how Local Law No. 124 will harm both workers and consumers. In January 2024, Seattle enacted its App-Based Worker Minimum Payment Ordinance, which is similar to Local Law No. 124: It imposes a minimum base-pay standard on app-based delivery workers for deliveries beginning or ending in the city. *See* Seattle Municipal Code § 8.37.050. Drawing on task-level data from Gridwise covering DoorDash, Uber Eats, Grubhub, and

Instacart—the same platforms regulated in New York—the National Bureau of Economic Research conducted a rigorous empirical study of the effects of this ordinance. *See* Yuan An, Andrew Garin & Brian K. Kovak, *Delivering Higher Pay? The Impacts of a Task-Level Pay Standard in the Gig Economy* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34545, 2025) ("*NBER Paper*"), http://www.nber.org/papers/w34545. The NBER's findings substantiate that Local Law No. 124 will harm shoppers and consumers.

First, the mandated shift to higher base pay was substantially offset by collapsing tips and a reduction in available work. Average base pay per task in Seattle more than doubled after the ordinance took effect. But average tips per task "declined by $1.51," eliminating more than one-third of the base-pay increase. *Id.* at 19 & tbl. 2. And the decline in tips—combined with the decreased availability of work—meant that frequent drivers derived *no* benefit from the purportedly worker-protective ordinance. *Id.* at 2. (finding that the increase in earnings per task "was offset by a decline in the number of tasks completed per month, beginning in the second month after the pay standard was implemented," and that increase in base earnings was "fully offset by the decline in tips"); *see also id.* at 27 ("[I]ncumbent drivers saw an increase in monthly earnings, but those earnings subsequently fell back to their pre-treatment level, due to a reduction in the tasks available to incumbent drivers.").

19

Second, the gains in pay per task came at the cost of deterioration in working conditions. Among the drivers who used the platform the most, the share of working time actually spent on paid deliveries fell by 11 percentage points. *Id.* at 24. The authors observed that unpaid wait time between tasks rose by approximately five minutes—a substantial increase relative to pre-period averages of six to seven minutes. *Id.* Worse still, the distance driven between tasks increased in tandem with the wait times, meaning workers continued to incur fuel and vehicle wear during the additional unpaid idle time. *Id.* at 24-25. The authors' conclusion is unequivocal: "In all, we find no evidence that incumbent drivers benefit through non-earnings margins." *Id.* at 3, *see id*. at 25.

Third, Seattle's ordinance made consumers worse off. Platforms responded to the new regulated labor costs through a combination of new flat fees and changes to the consumer-facing tipping interface, with the predictable effect of raising what consumers actually pay at checkout. A basket that cost $12.59 in Spokane cost $23.79 in Seattle for the same goods, with the difference driven by a new $4.99 "Regulatory Response" fee, higher service fees, and increased estimated tax. *Id.* at 32, Fig. 1. Consumers also ordered less. The NBER authors documented that monthly delivery volume in Seattle declined persistently after the ordinance took effect, both in absolute terms and relative to trends in the rest of Washington. *Id.* at 17 & 37, Fig. 5.

In sum, what Seattle's experience demonstrates, and what Local Law No. 124 will replicate, is a regulation that harms gig workers it might have been thought to serve while imposing the heaviest burdens on the people least equipped to bear them.

**B.     The remaining new Local Laws similarly will harm workers and consumers.**

Local Law No. 124 was enacted as part of a five-bill package. The four remaining laws address distinct features of the platform's operations. Local Laws Nos. 107 and 108 regulate the consumer-facing tipping interface; Local Law No. 113 regulates the timing and itemization of shopper payments; and Local Law No. 123 imposes recordkeeping and reporting requirements on the platform. Those new laws, too, will increase costs while doing nothing to benefit shoppers.

Local Laws Nos. 107 and 108 require Instacart to display two prescribed tipping options to consumers—a 10% option and a blank, customer-filled option— "in a conspicuous manner" before or during checkout. *See* N.Y.C. Local Law No. 107 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-107; N.Y.C. Local Law No. 108 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-108. These provisions are presented as pro-worker measures. The Seattle experience demonstrates that they will not function that way.

When Seattle's minimum-pay ordinance took effect, platforms responded predictably to the increase in regulated labor costs. Some, like DoorDash and Instacart, imposed flat "regulatory response" fees on Seattle orders. *NBER Paper*,

*supra*, at 8. Others, like Uber Eats, changed their tipping interface to remove the option to tip at checkout, while still allowing Seattle consumers to tip after delivery was complete. . *Id.* The empirical effect on workers was severe: average tips per task in Seattle declined by $1.51, offsetting more than "one-third of the increase in base pay" the policy was designed to create. *Id.* at 19 & tbl.2; *see id.* Fig. 3 (showing tip declines across DoorDash, Uber Eats, Grubhub, and Instacart in Seattle but not in the rest of Washington).

Local Laws Nos. 107 and 108 prevent Instacart from responding to the increased costs of Local Law No. 124 by deemphasizing tipping. By statutorily requiring conspicuous display of a 10% tipping option, the laws ensure that tipping remains a visible and significant component of consumer cost. But they cannot, of course, mandate that consumers actually tip. As the Seattle experience shows, when consumers are simultaneously presented with a higher base price (driven up by the new pay standard) and a conspicuous tip prompt, the predictable response—at least for those consumers who do not want their costs to go up—is to reduce the tip. The shopper, who under Instacart's current model relies on tips for a substantial portion of total compensation, bears the loss. Coupled with the new flat fees that platforms may be forced to impose to recoup labor costs, the consumer pays more for groceries and the shopper takes home the same, or less, than she did before.

22

Local Laws Nos. 113 and 123 reshape the platform's back-end. Local Law No. 113 requires Instacart to pay all amounts owed to a covered shopper within seven days of the close of a designated pay period and to provide each shopper a written statement that itemizes "all compensation" along with "any permissible deductions or allowances." N.Y.C. Local Law No. 113 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-113; *see also* Tandler Decl. ¶ 24(C) (summarizing Local Law No. 113's seven-day-payment and itemized-statement requirements). Local Law No. 123 layers on a recordkeeping and reporting regime that requires the platform to retain and potentially disclose detailed trip-level information for every order completed in New York City. N.Y.C. Local Law No. 123 (Sept. 10, 2025), https://intro.nyc/local-laws/2025-123; *see* Notice of Adoption, *supra*, at 27. These provisions are unnecessary. The City offered no basis for concluding that grocery-delivery shoppers were experiencing the late-payment or under-disclosure problems the rules ostensibly address. And the compliance costs that Laws 113 and 123 will impose ultimately must come from somewhere: from shoppers, in the form of further restrictions on platform access and reduced operational flexibility; and from consumers, in the form of additional fees layered on top of those Local Law No. 124 already produces.

The Local Laws, taken together, also will harm the small and independent grocers who depend on Instacart's platform to compete and who cannot absorb pass-

through cost increases. Many independent grocers and bodegas rely heavily on Instacart: The platform supplies the technology, the shoppers, and the consumer-facing storefront. *See Instacart Report*, *supra*, at 4, 20 (explaining that small businesses, including independent grocers, rely heavily on Instacart). When Local Law No. 124 forces Instacart to constrict shopper access, when Local Laws Nos. 113 and 123 raise the platform's compliance costs, and when Local Laws Nos. 107 and 108 suppress the tips that subsidize lower per-order fees, the costs are passed through to retailers. Large grocery chains can absorb the disruption, but the bodega in the Bronx and the Caribbean grocer in Flatbush will not. A regulatory package marketed as a corrective to corporate platforms will, in operation, solidify large incumbents' control over the City's grocery delivery market.

In sum, the Local Laws are misconceived. The City Council acted in response to genuine concerns about gig-worker compensation. But good intentions do not validate a regulatory design whose predictable effect is to leave shoppers no better off in total earnings, to displace a substantial fraction of them from the platform entirely, and to raise the cost and reduce the availability of grocery delivery for the consumers who have come to rely on it. The empirical record makes those effects visible: The Local Laws will not protect shoppers but will instead undermine the gig economy's flexibility and low barriers to entry that attract shoppers to Instacart's platform.

24

## CONCLUSION

The judgment of the District Court should be reversed.

May 15, 2026

Stephanie A. Maloney
Matthew P. Sappington
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
smaloney@uschamber.com
msappington@uschamber.com

Respectfully submitted,

/s/ Adam G. Unikowsky

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), and Local Rule 29.1(c), I certify that this brief complies with the type-volume limitation because this brief contains 5,532 words, excluding the portions exempted by rule.

Pursuant to Fed. R. App. P. 32(a)(5) and (6), this brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

/s/ Adam G. Unikowsky

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Adam G. Unikowsky